# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT SMITH, | )<br>)<br>) Civil Action No. |
| Plaintiff, | ) 16-11714-FDS<br>) |
| v. | )<br>) |
| TOWN OF WEST BRIDGEWATER,<br>JERRY D. LAWRENCE,<br>DONALD CLARK,<br>VICTOR R. FLAHERTY, JR., and<br>CHRISTOPHER WERNER, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action for alleged whistleblower retaliation. Plaintiff Robert Smith was employed as a special police officer in the town of West Bridgewater for more than thirteen years. He contends that he was suspended and then removed from his position in retaliation after he reported to the police chief that his sergeant was giving special treatment to a town selectman, who was also a close friend of the sergeant. The individual defendants and the Town of West Bridgewater contend that he was not reappointed because of his record of insubordination, and have filed separate motions for summary judgment as to all the remaining claims against them.

Because Smith did not have a property interest in his continued employment as a special police officer, the individual defendants' motion for summary judgment will be granted as to his due-process claim under 42 U.S.C. § 1983. That is the only federal claim asserted in this matter. The Court will decline to exercise its discretion to retain supplemental jurisdiction over the

remaining state-law claims, and therefore will remand the case to Plymouth County Superior Court.

## I. Background

### A. Factual Background

The following facts are undisputed unless otherwise indicated.

#### 1. The Parties

Robert Smith was appointed as a Special Police Officer ("SPO") for the West Bridgewater Police Department ("WPD") on October 30, 2002. (Ind. Defs. SMF Ex. 3). He previously served as a sergeant in the WPD before retiring in 2002. (*Id.* Ex. 4 at 46:18-47:15, 60:10-12). Smith's last day of employment was on May 5, 2016. (*Id.* Ex. 4 at 34:10-35:9).

The Town of West Bridgewater ("Town") employed Smith through the WPD. (Ind. Defs. SMF Ex. 3).

Jerry Lawrence is a selectman for the Town, who has served continuously since 2006. (Ind. Defs. SMF Ex. 7 at 10:19-11:2).

Donald Clark is a former WPD police officer. (Ind. Defs. SMF Ex. 20 at 10:7-9). He began his employment in 1986, and was made Chief of Police in 2004. (*Id.* Ex. 20 at 10:7-9, 15:20-24). He retired in July 2016. (*Id.* Ex. 20 at 17:11-22).

Victor R. Flaherty, Jr. is the current WPD Chief of Police, appointed on March 9, 2016. (Ind. Defs. SMF Ex. 5 at 5:3-7).

Christopher Werner is a sergeant with the WPD. (Ind. Defs. SMF Ex. 13 at 9:13-15). He joined the WPD in 1996 and was promoted to sergeant in August 2005. (*Id.* Ex. 13 at 6:3-8, 9:13-15).

#### 2. Officer Monteiro Encounters Lawrence

Smith retired from the WPD force in 2002, and soon after was appointed to the position

of SPO with WPD. (Ind. Defs. SMF Ex. 3, Ex. 4 at 60:10-12). According to Smith, on April 12, 2015, WPD Officer Matthew Monteiro asked to speak with him at the WPD station. (Ind. Defs. SMF Ex. 4 at 203:23-204:14). Monteiro told him that he recently pulled over Lawrence for several driving violations, including an expired inspection sticker, driving without his license in his possession, and attaching license plates to an incorrect vehicle. (*Id.* Ex. 4 at 204:22-205:14; *see id.* Ex. 11 at 9:1-10:21, 16:16-17:1, 32:23-33:4). Smith testified that Monteiro was upset because Werner had told him to release Lawrence with no further police action and not to enter the stop in the logbook. (Ind. Defs. SMF Ex. 4 at 205:4-206:15).

Monteiro testified that he recognized Lawrence's name when he stopped him and knew that he was a selectman. (Ind. Defs. SMF Ex. 11 at 11:16-12:3, 14:10-22). As a relatively new officer who had served just 14 months, he called Werner, his superior, to ask advice on how to proceed. (*Id.* Ex. 11 at 11:15-12:19).[1] After the call, Monteiro released Lawrence with a verbal warning and did not enter the incident into the official police log. (*Id.* Ex. 11 at 19:12-18).[2] He could not remember whether he had yelled at Lawrence during the stop. (*Id.* Ex. 11 at 19:24-20:15, 41:17-42:19). At some point, Monteiro learned that another officer had noticed a problem with Lawrence's plates approximately two weeks before Monteiro stopped him, but he could not remember when he learned that. (*Id.* Ex. 11 at 35:1-36:4; *see id.* Ex. 13 at 46:4-48:11; *id.* Ex. 7 at 31:5-12).

Werner testified that he did not specifically tell Monteiro how to proceed during the motor-vehicle stop, but only informed him that he had discretion to release Lawrence with a

---

[1] Monteiro could not remember whether he had called the unrecorded line, but said it was his "common practice" to call that line if he had a question. (Ind. Defs. SMF Ex. 11 at 19:4-11).

[2] Monteiro testified that he had called Werner for advice on some stops before and chosen not to log stops before, but could not remember if he had previously done so for the particular combination of motor-vehicle violations that Lawrence had. (Ind. Defs. SMF Ex. 11 at 13:2-14:9, 24:21-26:8).

3

warning. (Ind. Defs. SMF Ex. 13 at 28:9-29:21). According to Werner, officers also have discretion as to whether motor-vehicle stops are logged into the WPD system. (*Id.* Ex. 13 at 38:5-41:23). Werner testified that at the time he spoke to Monteiro on the phone he did not know that another officer, Officer Winkler, had previously noticed that there was an issue with Lawrence's plates. (*Id.* Ex. 13 at 45:22-46:7). At some point, however, he learned that Winkler had seen Lawrence's car parked in the parking lot of the Town Hall and noticed that the plates were registered to a different vehicle. (*Id.* Ex. 13 at 46:4-48:12). Werner also testified that he and Lawrence had been close personal friends for many years, although they had recently grown a little bit distant. (*Id.* Ex. 13 at 10:6-18). In recounting a conversation with Lawrence sometime after Monteiro pulled him over, Werner stated that Lawrence was upset over being lectured by the officer during the stop. (*Id.* Ex. 13 at 32:9-33:8).

Lawrence testified that he apologized to Monteiro and told him that Winkler had told him to take care of the registration issue weeks ago. (Ind. Defs. SMF Ex. 7 at 31:5-12). He said Monteiro yelled at him and told him he should be ashamed of himself. (*Id.* Ex. 7 at 31:14-16, 32:19-33:1). He testified that he was "pretty shaken at the way [he] was talked to" and that four or five days later he contacted the police station to say that "if I ever heard an officer talk to anybody the way he was talking to me, other than someone that has committed a violent crime, I would be really not happy as a selectman." (*Id.* Ex. 7 at 40:5-17).

### 3. <u>Smith Encounters Lawrence</u>

On April 22, 2015, Smith was assigned by WPD to perform detail work in West Bridgewater. (Ind. Defs. SMF Ex. 4 at 211:13-212:1).[3] During his shift, Smith saw Lawrence

---

[3] Smith performed an eight-hour detail for Verizon on April 22, 2015; he provided traffic safety control for workers and was paid $360 for his services. (Ind. Defs. SMF Ex. 4 at 38:11-39:21).

near the playground area of the Howard School and his car parked in the parking lot nearby. (*Id*. Ex. 4 at 213:5-19). Lawrence approached him and asked how he was enjoying his retirement. (*Id.* Ex. 4 at 214:4-24). Smith responded by asking Lawrence if he had taken care of his car registration, and he said that he had. (*Id.* Ex. 4 at 215:1-8). After Lawrence had left, Smith called the WPD unrecorded dispatch line from his cell phone to request that they run Lawrence's plates through their system. (*Id.* Ex. 4 at 216:1-217:3). The desk officer on the line ran the plates and told Smith they were active. (*Id*. Ex. 4 at 217:2-3).

According to defendants, at the time of the call from Smith, WPD had a policy that SPOs were not to engage in law enforcement activities (such as calling in license plates) while working a detail. (Ind. Defs. SMF Ex. 6). This stated policy was set forth in a memorandum that was issued by WPD Chief of Police Anderson in 1992. (*Id.*). Smith testified that he had heard of the memorandum at the time of the call on April 22, 2015, but had never actually seen it and believed it did not constitute official policy. (Ind. Defs. SMF Ex. 4 at 117:2-24, 119:11-17, 126:1-9). According to Smith, the memorandum was referred to as the "Tuck Rule," and was written to apply only to a former officer named Phil Tuck, who pulled over multiple cars while working private details, leading the private companies involved to complain that he was not doing the job that they hired him to do. (*Id*. Ex. 4 at 126:6-128:11). Werner testified that SPOs have made arrests while on detail despite the memorandum. (*Id.* Ex. 13 at 15:24-16:19). Monteiro also testified that officers working a detail have previously called into WPD dispatch to run plates, that he is not aware of any rule or policy against it, and that he had never heard of anyone getting suspended for doing that. (*Id.* Ex. 11 at 39:10-40:5).

Werner overheard Smith's call into the WPD to run Lawrence's plates while he was working near the dispatch center. (Ind. Defs. SMF Ex. 13 at 59:1-12). He testified that he found

5

the call unusual because SPOs do not normally call in plates. (*Id.* Ex. 13 at 59:22-60:6). Werner testified that he discussed the matter with Flaherty, who told him to speak with Smith and remind him that SPOs are not issued citation books and should not be involved with motor-vehicle enforcement while on detail. (*Id.* Ex. 13 at 62:21-63:19).

### 4. **Suspension**

When Smith returned to WPD after his detail was complete, Werner called him into his office. (Ind. Defs. SMF Ex. 4 at 229:11-20). Werner asked Smith why he had called in the plates; Smith replied that he knew Lawrence's plates were not properly registered and wanted to ensure the vehicle was legal to be on the road. (*Id.* Ex. 4 at 231:1-8). According to Smith, Werner accused him of "trying to start . . . a shit show," then told him he had previously been told not to enforce traffic regulations while on detail. (*Id.* Ex. 4 at 233:1-2, 234:11-21). Smith pointed his finger at Werner and responded, "Don't accuse me of doing something or knowing something that was not told to me. I was never told that, ever." (*Id.* Ex. 4 at 234:11-21). The conversation then escalated, with both men pointing at each other and raising their voices. (*Id.* Ex. 4 at 233:6-23, 237:2-23). At some point, according to Smith, he decided they were not getting anywhere and told Werner that he was done with the conversation and left the office. (*Id.* Ex. 4 at 235:14-18). Smith testified that Werner never told him to stop enforcing traffic laws while on detail and never told him not to leave the office. (*Id.* Ex. 4 at 97:9-15, 234:2-5, 235:4-7). Werner followed him outside the office and told him he was suspended from the detail list. (*Id.* Ex. 4 at 235:22-24). Smith testified that he asked Warner what authority he had to do that, and he pointed to his sleeve and said, "Right here. If you don't like it, go over my head." (*Id.* Ex. 4 at 236:2-8).

Werner testified that Smith repeatedly told him he would not follow his instructions to stop engaging in traffic enforcement while on detail, and repeatedly questioned Werner's

6

authority over him. (Ind. Defs. SMF Ex. 13 at 82:23-83:23; *see id.* Ex. 14, 15). One of the officers sitting outside Werner's office wrote in a memo dated August 3, 2016, that Werner told Smith, "Don't walk away from me, Smitty, I'm not done talking to you," and "If you walk out of here you can consider yourself suspended." (*Id.* Ex. 15).

On April 27, 2015, Smith met with Clark, who reaffirmed Werner's decision and suspended Smith from the detail list for 45 days, citing his insubordination to Werner. (Ind. Defs. SMF Ex. 4 at 62:23-64:21, 94:2-16, 248:13-16). According to Smith, he told Clark during that meeting that he believed Werner "violated the law by telling [Monteiro] not to enter any of the related info concerning [Lawrence's April 12, 2015 vehicle stop] into the police log." (*Id.* Ex. 10 at Answer Nos. 5 & 6). According to Smith, Clark said he would look into the matter. (*Id.* Ex. 4 at 100:2-24). Clark testified that he spoke to Monteiro about his stop of Lawrence, but did not conduct any formal investigation or have Monteiro make a written report. (Ind. Defs. SMF Ex. 20 at 57:18-21, 76:20-22).

### 5. May 2015 Reappointment

The appointment and removal of SPOs is governed by Mass. Gen. Laws ch. 41, § 96, which provides:

> In any town in which such appointments are not subject to chapter thirty-one, they shall be made annually or for a term of years not exceeding three years, as the selectmen shall determine, and the selectmen may remove such officers for cause at any time during such appointment after a hearing.

Mass. Gen. Laws ch. 41, § 96. The Town appoints SPOs for a term of one year. (Ind. Defs. SMF Ex. 7 at 71:15-72:7, 84:19-21; *see id.* Ex. 3). The appointments are made each May by the West Bridgewater Board of Selectmen, of which Lawrence is a member. (*Id.*). The appointments are made based on recommendations by the Chief of Police, and they are customarily "rubber-stamped" by the Board. (*Id.* Ex. 7 at 71:15-72:7).

7

On May 20, 2015, less than a month after his suspension, Smith was unanimously appointed as an SPO for another year by the Board, having been recommended by Clark. (Ind. Defs. Ex. 9 at 9-10).

Upon Smith's return to duty on June 1, 2015, Clark testified that he instructed Smith not to run plates, write tickets, or do anything other than direct traffic. (Ind. Defs. SMF Ex. 20 at 66:7-13). After that, according to defendants, Smith stopped communicating with his superior officers. (*Id.* Ex. 4 at 66:10-67:21).[4]

### 6. May 2016 Failure to Reappoint

The following year, on May 2, 2016, newly appointed Chief of Police Flaherty gave his SPO recommendations to the Board. (Ind. Defs. SMF Ex. 16). Smith was the only eligible officer not included as a recommended SPO for the next year. (*Id.* Ex. 5 at 82:6-84:8). The Board unanimously voted to approve the list of recommended SPOs. (*Id.* Ex. 17 at 2). Flaherty conceded in his deposition that nothing occurred between Smith's reappointment in 2015 and non-reappointment in 2016 to warrant "just cause" for his termination. (*Id.* Ex. 5 at 102:22-103:5). However, when asked why he did not recommend Smith for reappointment as an SPO in 2016, Flaherty testified that:

> [The reason I elected not to recommend Smith as an SPO was] [h]is insubordination record. His lack of communication with the sergeants. We have young sergeants, young officers, and they felt restricted and tension with the fact that they would speak with [Smith] about certain situations that they felt needed to be done, when he comes back and says he argued with them or says that's not the way I'd do it and if there's an issue I'll just go see the Chief. So a lot of us sergeants, younger sergeants were really afraid to the fact that they didn't want to approach him. Younger officers were seeing this. I didn't think it was appropriate for our younger officers to believe that this was appropriate, and

---

[4] Smith disputes that fact "to the extent that the above-statement implies that the Plaintiff was the reason the individuals stopped communicating," although he does not provide a clear reason for the cessation of communications. (Pl. SMF ¶ 23).

8

that's why I discontinued and didn't recommend [Smith] to be reappointed.

(Def. SMF Ex. 5 at 44:4-21).

Smith had been previously disciplined twice for insubordination, once in 1997 and once in 2002. (Ind. Defs. SMF Ex. 18; *id.* Ex. 4 at 86:10-92:22). Smith testified that the 2002 complaint filed against him had been dismissed on appeal to the Civil Service. (*Id.* Ex. 4 at 89:17-24).

Flaherty personally informed Smith he had not been reappointed on May 5, 2016. (*Id.* Ex. 4 at 36:12-37:4). Flaherty did not give a reason to Smith for his non-renewal at that time. (*Id.* Ex. 4 at 40:24-41:10).

**B.      Procedural Background**

Smith filed this action in state court on June 27, 2016. Defendants removed the case on the basis of federal-question jurisdiction pursuant to 28 U.S.C. § 1331.

The complaint contains four claims. Count 1 alleges a violation of Mass. Gen. Laws ch. 149, § 185, providing protection from retaliation to whistleblowers, against the Town. Count 2 alleges violations of Massachusetts Civil Rights law against defendants Lawrence, Clark, Flaherty, and Warner, in their individual and official capacities. *See* Mass Gen. Laws ch. 12, §§ 11H, 11I. Count 3 alleges a claim for civil conspiracy against all defendants. And Count 4 alleges a § 1983 claim for violation of plaintiff's procedural-due-process rights against all defendants.

Defendant Town of West Bridgewater moved to dismiss all claims against it for failure to state a claim upon which relief can be granted. The motion was granted as to Counts 3 and 4 and denied as to Count 1, which is the only remaining claim against the Town.

The Town has moved for summary judgment as to Count 1. Defendants Clark, Flaherty, Lawrence, and Werner have moved for summary judgment as to Counts 2-4.

9

## II. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation mark omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must "view the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III. Analysis

### A. Count 4: Procedural Due Process

The only federal claim in this case is Count 4, which alleges that defendants Lawrence, Clark, Flaherty, and Werner violated Smith's constitutional right to due process by removing him from his position without a hearing. Specifically, the complaint alleges as follows:

> At all relevant times, the Plaintiff possessed a constitutionally and statutorily protected property interest in his continued employment with the West Bridgewater Police Department.

10

> The actions of the Defendants in removing the Plaintiff from his position without a hearing as required under [sic] were retaliatory and taken with reckless disregard for the Plaintiff's constitutional rights, including, but not limited to, his rights under M.G.L. c. 41 § 96.
>
> The Defendants intentionally delayed until the annual appointments of Special Police Officers to remove the Plaintiff from his position rather than discharge him pursuant to M.G.L. c.41 § 96, which would have required a full hearing. This process would have revealed the blatant impropriety of the Department in covering up the violations of law by Defendant Lawrence and members of the Department.

(Compl. ¶¶ 61-63).

The complaint thus alleges a procedural-due-process claim under 42 U.S.C. § 1983. Section 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *see Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008). It is not a source of substantive rights, but a vessel for relief from deprivation of rights protected elsewhere by the Constitution or federal law. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Thus, Smith must demonstrate that there is a genuine issue of material fact as to whether defendants deprived him of a right protected by the Constitution or federal law.

The Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "For an interest in a statutorily created benefit to become a protected property interest under the Fourteenth Amendment, a person 'must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Coyne v. City of Somerville*, 972 F.2d 440, 443 (1st Cir. 1992) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). In the specific

11

instance of termination from state employment, to maintain a procedural-due-process claim, "a public employee must first demonstrate that he has a reasonable expectation, arising out of a statute, policy, rule, or contract, that he will continue to be employed." *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 101 (1st Cir. 2002) (citing *Perkins v. Bd. of Dirs.*, 686 F.2d 49, 51 (1st Cir. 1982)).

Smith points to Mass. Gen. Laws ch. 41, § 96 as the authority for his expectation of continued employment. As noted, that statute provides that "the selectmen may remove such officers *for cause* at any time *during such appointment after a hearing*." (Mass. Gen. Laws ch. 41, § 96) (emphasis added). By its terms, the statute provides for for-cause removal after a hearing only if the removal is effected "during such appointment." It is undisputed that the Board appoints SPOs for one-year terms. (Pl. Resp. to Ind. Defs. SMF ¶ 13). And it is well-established that annual contracts do not give employees a property interest beyond the stated duration of their contracts, regardless of previous reappointment. *See Gomez. v. Rivera Rodriguez*, 344 F.3d 103, 111 (1st Cir. 2003) (reversing district court's holding that continuously re-employed plaintiffs had property interest beyond stated duration of annual contracts). Therefore, the statute did not give Smith a reasonable expectation of continued employment beyond his annual term.

Smith alleges that defendants intentionally delayed his "termination" to hide the retaliatory reasons behind it. On a motion for summary judgment, the facts must be viewed in the light most favorable to the moving party. Therefore, the Court will assume, for present purposes, that Werner in fact ordered Monteiro not to write up Lawrence's driving violations; that the order violated WPD policy; that any existing policy prohibiting SPOs from enforcing traffic violations while on detail was not generally enforced; and that Smith was not reappointed

12

because he had complained about Lawrence's special treatment.

That evidence, even taken in the light most favorable to Smith, does not provide him a constitutionally protected property interest in his job. Even if he had received a hearing and defendants had not been able to provide cause for terminating him, Smith was entitled, at most, to employment through the end of his annual contract. He maintained employment for that term, and was in fact reinstated and kept as an SPO for an additional contract year. Therefore, any failure to give him a hearing has not resulted in deprivation of a protected property interest.

It is true that even absent a property interest in a job, public employees cannot be fired for constitutionally impermissible reasons. *E.g.*, *Bleeker v. Dukakis*, 665 F.2d 401, 403 n.3 (1st Cir. 1981) (explaining that plaintiff's "employment interest might well be protected against action 'based on some constitutionally impermissible ground, such as racial, religious or sexual discrimination, or retaliation for assertion of rights guaranteed by . . . the Constitution.'" (alteration in original) (quoting *Beitzell v. Jeffrey*, 643 F.2d 870, 876 n.13 (1st Cir. 1981))); *Beitzell*, 643 F.2d at 877-78 (examining potential liberty interest where no property interest exists).[5] However, Smith has not alleged that the retaliation here rises to the level of a constitutional violation; at most, it is a violation of state law. (*See* Compl. ¶¶ 50-54 (alleging violations of the Massachusetts whistleblower statute, Mass. Gen. Laws ch. 149, § 185)). "It is bedrock law in this circuit . . . that violations of state law—even where arbitrary, capricious, or undertaken in bad faith—do not, without more, give rise to a denial of substantive due process

---

[5] Even without a protected property interest in their continued employment, public employees cannot be fired in retaliation for exercising their First Amendment rights. *Gomez*, 344 F.3d at 111 n.5; *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 98 (1st Cir. 1997) (citing *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980)) (explaining that the *Elrod-Branti* line of cases "applies to a local government's decision whether to renew the contract of a transitory employee" and that "the fact that a transitory employee does not have a reasonable expectation of renewal in his or her employment that would require due process protections does not defeat a First Amendment claim"); *see also Garcetti v. Ceballos*, 547 U.S. 410 (2006). Here, however, Smith has neither pleaded nor argued that he was fired in retaliation for exercising his First Amendment rights.

under the U.S. Constitution." *Coyne*, 972 F.2d at 444. Accordingly, the individual defendants' motion for summary judgment will be granted as to Count 4.

B. <u>**Remand**</u>

Having disposed of the only federal question in the case, the Court must determine whether to exercise supplemental jurisdiction over the remaining state-law claims.

A district court's original jurisdiction extends, among other things, to "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. If an action includes both federal claims and state-law claims, then the district court may exercise supplemental jurisdiction over the state-law claims to the extend they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

However, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3); *Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 431 n.10 (1st Cir. 2010). The decision "is a 'pragmatic and case-specific' one" that is committed to the district court's discretion; the court "must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity." *Delgado v. Pawtucket Police Dep't*, 668 F.3d 42, 48 (1st Cir. 2012) (quoting *Roche v. John Hancokc Mut. Life Ins. Co.*, 81 F.3d 249, 257 (1st Cir. 1996)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Indeed, "it can be an abuse of discretion—if no federal claim remains—for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial

14

question of state law that is better addressed by the state courts." *Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017).

Here, the remaining state-law claims are for violations of the Massachusetts whistleblower statute, the Massachusetts Civil Rights Act, and civil conspiracy. Those claims—particularly the whistleblower claim, which derives from state policies affording greater protection than federal constitutional law—raise substantial questions of state law and would certainly be better addressed by the state court. While this case is not in early stages—fact discovery is closed and dispositive motions have been filed—no trial has been scheduled and no pretrial conference has been held. *Filson v. Langman*, 2002 WL 31528616, at *5-6 (D. Mass. Nov. 13, 2002) (remanding at summary judgment stage even though the case had been on the docket for more than three years and discovery had closed); *see also Conrad v. Caliber Home Loans, Inc.*, 2017 WL 1496922, at *2-3 (D. Mass. Apr. 25, 2017). Undoubtedly there may be some delay associated with the remand, but there will be little duplication of effort. Furthermore, the risk of delay and inconvenience is substantially outweighed by the interest of the state courts in deciding the substantive state-law issues presented here.

Accordingly, the Court declines to exercise its supplemental jurisdiction over the remaining counts. This case will therefore be remanded to the state court.

## IV. Conclusion

For the foregoing reasons, the individual defendants' motion for summary judgment is GRANTED in part as to Count 4. The case is hereby REMANDED to the Plymouth County Superior Court. The Court does not reach defendants' motions for summary judgment as to Counts 1-3, which will remain pending after remand.

15

**So Ordered.**

                                                                /s/ F. Dennis Saylor
                                                                F. Dennis Saylor, IV
Dated: July 10, 2018                                            United States District Judge